We'll go on to the last case on the calendar, Reichert v. Rapid Investments. You're fine. We'll just wait a minute so everybody's comfortable. Do you mind if I get a glass of water? Not at all. I think we're good. Thank you, Your Honor. May it please the Court, my name is George Verschelden, and I represent the Appellants, Rapid Investment, and Cash Valley Bank. I'd like to reserve three minutes for rebuttal. In this case, the District Court erred in denying the defendant's motion to compel arbitration based on a lack of assent. Under Washington law, assent is determined by a party's outward manifestations, their words and acts, that subjective intent of a party is irrelevant, under Washington law. And that's not disputed in this case. Big picture, Mr. Moyer received a release card loaded with the funds on his inmate trust account when he was released from Kipsap County Jail. The release card was physically affixed to a cardholder agreement containing the terms and conditions for using the card. The card was already activated and the charges were already running, is that right? The card was activated. What was your second? And the charges, the fees were already running in the sense that there was a three-day fee and it was calculated from before, from the activation, so before he got the card. I believe it started running the day he got the card, yes. But before he got the card. Well, to some extent. It's upon activation, right? It starts. Right. So it could have been minutes, it could have been hours. So it was already in operation, essentially. Yes. Once it's activated, it's ready to use. If he did nothing, did not use the card, he would still be charged that fee. It is possible to be charged a fee before you use the card, yes, Your Honor. Therefore, before he accepted the contract, even on your theory. Well, there are two ways to accept the card. With respect to Mr. Moyer, he used the card. Okay, this is what I don't understand. I'm going to go straight to this. Sure. The card says at ER 156, on the back of the card, it says, by accepting or using. No, it doesn't. It says accepting and or using, as you know. By accepting and or using the card, you agree to the account agreements, including the arbitration provision. Yes, ma'am. And your team's, your client's briefing consistently says he accepted your unilateral offer by using. So it just seems to me you're changing the offer because the written offer that this person received was by accepting and or using. And he had already accepted, but got handed him the card. So that's not our position, Your Honor. It's not your position, but it's what the document says. Well, but we don't, but receipt of the card from the correctional facility is not accepting it. That's my point. That's my point. Your briefing says, look, we're only arguing that he accepted by using. I get that. You said that repeatedly, and your briefing was very clear on this point. And I appreciate that. But it seems to me you're changing, that argument changes the offer that was extended to him. Because the written offer says by accepting and or using, and they've just handed this card to him. And, by the way, he didn't have another choice. But anyway, he accepted it. So why isn't it over at that point? Well, because the cardholder agreement also says you can reject the card by calling. Well, it doesn't say that either. It says something about you can cancel the card. And somewhere else it says that you can get a check for a $10 fee. You keep saying that he could get it for free by calling some number, but the document doesn't say that either. Well, there were – Mr. Moyer received at three different times three different cards. The card that – I'm talking about this card. Well, the card he received in February of 2018, the governing cardholder agreement, said that you can cancel the card and get a check at no cost. Is the governing cardholder agreement at ER-211? Am I looking at the wrong one? ER-214. 214. Yes, ma'am. Yes, Your Honor. So 211 says we're going to charge you $10 if you cancel this. It does say that, and that was governing cards that he had received previously. Okay, so let me ask you this. The card was handed to him, and is it like a trifold, it sounds like, with a window? With a window with a bar card so they can scan it like you would at a supermarket and load it, yes. Okay. So what did he see? We have the photocopy of the card up and back. The sticker that says, attention, this card has already been activated, I think was on the front. Correct. So was that through the window? Can you see that? Could he have seen that? That I'm not sure, Your Honor. So what could he see? Because the provisions you're talking about, it seems to me, would have been the folded up trifold thing. I'm not sure this is in the record. I think that the purpose of the window is allowed them to scan the card and load the funds onto it without actually removing it from the cardholder agreement. The bar card is on the back of the card. So I think the window that exposed the back of the card so they could take the trifolded agreement, scan it. I don't want to spend a whole lot of time on this, but your briefing talks about a bar code, and I think of that as a whole bunch of vertical lines. But this has the stripe that's on the back of a credit card, the solid line. That's what you mean by bar code, that thing? That's what was showing through? Both of them, I think. They're both on the back of the card. It's a cardholder agreement. Not on our card. The relevant cardholder agreement for February 2018 is on ER 214. Is that correct? Yes. Where does it say what you said it said about the check? About the check? I see where it says you may cancel your card by calling customer service, and then it doesn't say anything about getting a check for free. Where does it say that? Yes, Your Honor. So you see the middle column, and there's a list of card fees. And the last one where it lists the card fees as zero, it has close account with check disbursement. Well, that is a little bit cryptic. Someone's supposed to know that. Close account with what? Sorry, could you give it one more time? Close account with check disbursement. Okay. But nowhere does it say in ordinary English, if you don't want this card, you can ask for a check back for free. Well, it says you can cancel the card by calling this number if you don't want it. So how long would it take to get a check? Do we know that anywhere? How long would it take to get a check, and is there ever an offer to pay the money back with interest? It's his money. Yes. To just be clear, it's his money. He gets out of jail. They didn't say you can have your cash or your card. They just say here's your card. So, of course, he's going to take the card, because I think his choice is to not take his money. And he doesn't know he can call the 1-800 number until he opens the thing up, right? Correct. I mean, in fairness. He has to open it up. And then he has to be able to read what Judge Berzon was just asking about. But even if he did that, sir, there's some delay in getting the check. And it presupposes he's got an address. A homeless person wouldn't be able to do this, I don't think. Maybe these are all defenses to enforcement of a contract, but they're significant and very distracting, because this is a pretty extraordinary circumstance. So if you could go back to contract formation, because that's my problem. It seems to me that the offer was your client's unilateral offer, that he's accepting by performance says by accepting and or using. And Mr. Moyer accepted for use. But I understand that you want to talk about that. What does accept mean if it doesn't mean? So I'm going to see if I can butt in here a little bit. So his option was to either accept it or to ask for a check to be sent to him. Is that the way it goes down? And if he chose to get the check, he would have to wait some period of time, which we do not know how long. It may be a day, two days, three days. So the net result would be he would not have any money with him at the time that he left the jail, correct? That is correct. Now I want to ask another question, which may not have anything to do with the ultimate issues here, but it strikes my curiosity. Your client obviously agrees to enter into these arrangements with this prison. And I guess it's in that business. I imagine it enters into these arrangements voluntarily with many prisons, or is this the only one? No, this is not the only correctional facility. So it's in the business of contracting with prisons throughout the state and maybe many of them in the country who engage in this type of relationship. They willingly do that. It's a business opportunity for them, I suspect. Yes, they offer multiple payment instruments, and this is one of them, yes. And this is initiated by them to the prison or the prison reaches out to them? I know this may have nothing to do with the resolution of the case, but I'm just curious in terms of the practical dynamics as to how this unfolds. So with Kipsap County, they had a commissary contract with a defendant, Keith Commissary. And the commissary company offers many, many different types of services. One of the services that they offer is the use of release cards. As a general matter, I mean, as you know, I was on the Brown case, so I know something about these cards. And one of the extraordinary things to me is that here, for example, you are charging a weekly $2.50 maintenance fee. Is that usual in debit cards that you charge maintenance fees? That debit cards you get at banks charge people $2.50 a week to have the card? I don't think it's unusual to have a monthly checking account fee that is associated with a debit card. This is a $2.50 per week charge without regard to the amount on the card. This product offers many services and benefits, and there are costs associated with some of those. We obviously admit that. And if an individual doesn't want the card, doesn't want to use it, then they can call and say— They can have no money for three days. I'm sorry? Then they can have no money for a week. Well, that's part of their calculation. Whose calculation? Sorry. The individual. But the individual never asked for this to begin with. Well, the individual got arrested and, pursuant to Washington law, had their money confiscated. Could you go back to my contract information? I guess if the cash was available to the prisoner in an envelope, you would have no business. That's beyond what we do. We have no control over that. No control over that. So the fact that the prisoner decides not to make the cash available gives you this business opportunity, correct? Yes, it's a product that we offer. Yes, I understand. I'm sorry, Your Honor. That's okay. No problem. Back to the question about your client's unilateral offer, by accepting and or using. Your brief argues that he accepted by using, but it seems to me that's changing the terms of the offer because the written offer extended to him was by accepting and or using. Right. So accepting and or using. I would argue to you that if an individual is given a release card affixed to terms and conditions and that individual decides to use it, a reasonable person would say you're using it subject to those terms and conditions. I have somebody who actually took time to read one of these agreements, and we all receive them all the time, and we enter into arbitration agreements every time we rent a car, or rent a hotel room, of course. We're very familiar with that. But this individual is a person who just got out of jail. If he or she actually opened the trifold and read the agreement, it's too late. It doesn't matter whether they use it because they've already accepted by taking the card. Well, I don't agree with that. Why not? That's my question.  How do they know that, sir? They only know that once they unwrap the whole thing and look and find the 1-800 number, and you have to be able to understand that that's what the sentence means that Judge Berzon just read into the record, but it seems to me it's all too late. Well, no. If an individual, if Mr. Moyer had called, he received the card, called, said— Actually, what the document says is you can cancel it. It doesn't say you cannot accept it. It does say cancel. You can only cancel something that you already have. Well, so I'd like to go back to that point, but I'd like to stick with your point, Your Honor. If an individual, if Mr. Moyer had called and said, I don't want the card, I want a check, my clients would send him a check and would not contend that any contract had been formed. Well, that does require a bit of speculation, but he would have to have an address, right? That's one of the back-end problems. He'd have to have an address. There's no offer to pay interest, right? And he'd have to wait some period of time. And this person, of course, has just gotten out of jail. So we wonder about the ability to really exercise that option. In other words, whether there's essentially coercion because the only way they're going to get their money when they need their money is by using the card. Well, I would point out that in the Pope case versus Easy Kiosk where arbitration was compelled, it was a situation where, granted, it was at the jail and not from the cardholders or the card providers, but, say, you can pick between a check and a release card. At the jail is a completely different story because then at least you have something in your hand. No, the check was still mailed to them in that case. It was the same circumstance. But there was no choice given here, right? Was there? Well, the choice was right on the cardholder agreement. I don't think... But was the other choice... I'm not trying to give you a hard time, but to make sure that I'm understanding this, is the other choice the expectation that someone leaving jail would just walk away and leave his money on the counter? Leave the card on the counter? No, no, I agree. I agree with that point. And that's why the district court focused on the idea of, well, can silence be consent? But this is the problem. You're relying on the cardholder document agreement contract rigidly with regard to the recipient, but when we try to tell you that the agreement says accept, it says cancel, it says... Well, we wouldn't read it that way, but that's what it says. It says you get it by accepting it. If accept isn't getting it, what does it mean? I think in this context, accept means retaining it, not just walking out of the jail with it, because when you walk out of the jail with it, you still have the ability to cancel it. But cancel means you have... I mean, you don't cancel something you never had, a service you never had. You first have to have accepted it to cancel it. So I think this goes back to Washington law dealing with... And I know I'm over time, but... No, you're fine. So I think this goes back to Washington law that the district court relied on, that talking about, so when can silence be assent? And generally speaking, it can't be. But Washington law also says that silence can be assent if there's a duty to speak. And here, the Kitsap County Jail is providing a release card. That's the financial instrument that they're using to return confiscated funds to, in this case, Mr. Moyer. If Mr. Moyer wants that money in a different form, a different financial instrument, in this case a check, then he has a duty to speak. He has a duty to contact, call the customer service number and request it. But he cannot get it when he leaves the jail under those circumstances. The county doesn't offer that option, no. And Rapid's not there. Rapid can't offer that option at the jail either. I'm not saying that. I'm saying that the option of canceling the card and getting a check sometime later is not the equivalent of having the money available to him when he gets out of the jail. Even as a check, in any form. He doesn't have his hands on anything that is his money when he leaves the... This card does not give him that option. It gives him the option of having, if he uses it and therefore opts into all these fees, essentially, he can have some money. And if he doesn't use it, he has no money for three days or five days or a week. If he can understand the incredibly opaque statement here anyhow. And I understand Your Honor's concern. And I think that's more of a policy decision for the county. No, because it suggests that the use is not willful. It's not voluntary. That any inference from the use that he has accepted the card is a coerced acceptance because he has no ability to get his money any other way when he needs money. Well, Your Honor, so respectfully, I think those are contract enforcement defenses. I think they might be. They're certainly concerning. But can we circle back to where we started? I think all three judges have hit on this point about the language of the offer, accepting and or using. And I think you said in response to one of Judge Berzon's questions that accepting is walking out of the jail with it. Is that right? Is that your position, walking out of the jail with the card? It's not acceptance, no. Oh, what is acceptance then? It has to be something different than using because it says by accepting and or using. So what's accepting? So I think acceptance is retaining it. That's why I thought you meant walking out of the jail with it, retaining it. Well, no, because they don't have it. If the county doesn't give them an alternative, then what? So in other words, if he keeps it for, what, two hours a day or something, then he's accepted even if he doesn't use it. Even if he doesn't? Yes. This man did not use it immediately. He used it, what, a couple hours later. So did he accept it before he used it? Yes, I think you can accept it before using it, although I'd point out that's not Mr. Moyer's case. But why isn't it Mr. Moyer's case? Well, Mr. Moyer used it the same day. And our point is we think by then it was too late. He'd already accepted it under the terms, and that's what I'm trying to get at. And you're saying he retained it. It's not when he walked out of the jail, but at some time in there he's deemed to have retained it. My question is just when is that? At what point would you say he has accepted it, agreed to the terms of the arbitration provision by accepting? Probably by the time any fee is charged on the card. And so if you cancel the card before then, I think that's fine. Okay, and he would have no way of knowing when that is. Well, it's listed. It was later that day, wasn't it? Later that day. It's been activated. He knows that much because the sticker tells him that much. Right. No, he wasn't charged a fee later that day. Not the maintenance fee. Only when he used the card. Yes. Okay. Yes. You're way over time, so we need to hear from opposing counsel. And thank you for your patience with our questions. We'll put two minutes on the clock when you come back. Good morning, Your Honors. Thank you very much. My name is Chris Shouts, and I represent the plaintiff class in the Rikert litigation. I think the court has focused pretty much on one of the major issues in this case, which is acceptance. And there can be no question that acceptance is when Mr. Moyer walks up to the window, he's handed this tri-packet, and somewhere in there is supposedly his money. And we can say that because we know from that instance one of the fees that's charged under that card is already beginning to accrue. So as you walk away, the card is not only active, activated, it is, quote, accepted. He has no choice. He walks out. Right. But, counsel, you know, of course, as well as we do, and we've been reminded frequently about arbitration provisions, right? And so if I went to Hertz Rental Car and signed, I think there's a lot of case law that says that's a binding arbitration agreement if I accept it. I'm sorry, Your Honor, I missed you there. Well, I'm just saying that there are a lot of other provisions, arbitration provisions contained in airline tickets and rental car agreements where people have come into court and said I haven't agreed to arbitrate because Hertz didn't give me a choice. United Airlines didn't give me a choice. And those provisions have been deemed enforceable, right? Typically. They have, and it depends on notice, but that raises a good point, Your Honor, because in those cases, like when you go to buy, well, rent a car was your example. You go to rent a car. You're seeking a car. You're requesting a car. You're reaching out to make an agreement with a company. I'm also initiating. You're certainly making an agreement. You are making an agreement. Yeah, and you know what you're going to do. You're going to go up. I need a car. I'm going to rent a car. I'm going to enter into an agreement. The extent then that you're going to say, well, I know there's going to be some terms here associated with this, and what am I going to do and look for? And that's what happens in a lot of these Internet cases, too, about the arbitration agreements. You know, you go online, you order something, and you click something, and the question is have you received adequate notice of what's in that. But we're not even close to that with this kind of arrangement where you walk up. You're not requesting a car. You're expecting your own money back. Why would you have any conditions associated with receiving your own money back? But opposing counsel's argument is, you know, you argued that's their money. That's the person's money, and opposing counsel's argument is that part of your client's argument really is with Kitsap County because Kitsap County is the one that has the obligation to return the money, and his position is that his client is a vendor providing a service. But it's not Kitsap County that takes the fees. It's not Kitsap County that creates the contract or the procedures or anything else that's forced on Mr. Moyer. The fact that they come and sell this service to the county so the county can get out of the business basically of returning money is what's happening here. It's their decisions to try to include an arbitration provision to set, you know, put the amounts of fees they're going to be charged. Let me ask you this, if I may. Yes, sir. Once in a while I peep in, okay? You have a class action against this company. I get it, right? Yes. Okay. Now, it seems to me that the underlying culprit is the county. They're the ones that decide to enter into this type of arrangement with the credit card company. I guess you never thought about suing the county. It seems that they're the underlying culprit that should be held responsible. Under the Electronic Funds Transfer Act, which is the main claim that we've got in this case, your claims are strictly against the insurer. But you could have brought, I guess, additional maybe 1983 claims against the county. You chose not to do that, right? We chose not to sue the county under a 1983 claim. Could we have come up with a claim because they transferred the money to their account? Possibly that's, and we've looked at that, but on the other hand. It was a judgment call you made to go into the credit card company. Well, it's more than that, Your Honor, because the fees and all that stuff, the county didn't tell them what they charge or what kind of arrangements were being enforced on them. It was the county that decided not to give these people cash when they get out of jail. I guess the county thought that it was a good way to... But for present purposes, the relevant question is, as to what this lawsuit is about, those conditions have pertinence to whether an agreement was entered into because, as you point out, however, when it gets there, these people were not making a choice. So that the party that is entering into a contract or wants to enter into a contract with them has to take account, one would think, of the fact that they did not make a choice to have the speed of vehicle. Exactly, it was the county that made the choice for these people. Right, but what I'm trying to switch gears a little bit and say, although the county made the choice, the fact that the county made the choice is pertinent to the conditions in which any contract was entered into and therefore to the nature of the question before us, which was, was there a contract entered into? Because the conditions are, as you point out, not the usual conditions in which a contract is entered into. It seems to me the condition that's different between renting a car or renting an airline or buying an airline ticket, to just follow up on Judge Berzon's point, is really what the district court put its finger on, and it is that Mr. Moyer didn't initiate anything. He didn't initiate anything. Opposing counsel's argument is that it's a unilateral contract and they can call for performance any way they want and they call for performance a particular way. We're giving speeches now, but just to respond, and although that may have been Kitsap County's fault, it was still the condition that was before the company when it was purported to enter into this contract. Yeah, I think it's like we stated in our brief. They essentially try to blame the county and say, well, it's their fault for agreeing to hire us to run this program. None of that matters, because what matters is when he walks up to the window and he's presented this thing, it doesn't matter whether it was at Kitsap County's insistence or at Rapid's insistence or whoever, it has an arbitration provision that he did not agree to be found by. Counsel, I think it may matter, and my intention isn't to give a speech, but I do want to know what it is I'm missing, because just as a matter of legal theory, I think some of the arguments that you make are not defenses to contract formation. That's my concern. I'm trying to get at contract formation, not the back-end defenses. Am I wrong about that? I'm not sure. I think you're wrong, respectfully, Your Honor, to the extent that when somebody is forced to take something, we're talking about mutual assent here. We still have to have mutual assent, and under this arrangement, you have no choice, because the minute you're handed the document, you've already, quote, assented and are already starting to pay fees. They keep insisting that isn't true, and that their interpretation of the contract is that isn't true. And so let's assume for the moment that it isn't true, that they say that he did not. They believe, although it's difficult because, as you say, the money has already accrued, the fees are already accruing, that it wasn't accepted until some later point, the later point being either when he used it or maybe when he kept it up to some undefined point. If that were the case, would it matter to your case? I'm sorry. Would that matter to your argument if they had a written document saying, well, accept means X, and it doesn't mean when it's handed to you? Well, and I think the other thing about their argument is, well, he used it. Well, and exactly what does that mean? Because do you use the card if you just, like Mr. Riker did, you make an inquiry on the card just to see how much it is? Because unlike a check, you can see how much is there. So Mr. Riker took his card and tried to figure out how much was really on it, and he was charged a fee. Well, was that using the card, even though it wasn't any particularly great service advantage? So what is the service? What does the use of the card really mean? And I think the other part of this is they're trying to relate this to the style of the unilateral contract, where you accept by performance, but this is not the kind of performance, you know, like a unilateral contract in my mind is I will pay you $25 to mow my lawn if you mow my lawn. And if the person mows your lawn, you pay them $25. If they don't do anything, they've rejected your offer. What exactly is the performance that shows that there is an acceptance in the way of the unilateral contract they're talking about? There is no such performance. All they're doing is he takes the card, he gets his money, he gets charged a fee. What's his performance in that realm? What we truly have is a contract that in the normal sense like the rental car would be the exchange of promises. Here are this and here is this. It wouldn't be by, you know, driving the car. Your rental contract doesn't become effective until you drive off the car. But they're trying to force it into something to claim that that's the only thing they can claim that shows some form of assent because there's nothing else that he does or the other prisoners do when they're released with these cards that manifests any type of assent. So that's what they have to rely on is the fact that they use the card. And that's just not simply enough. In Washington law, you know, this whole thing about rejection, which I guess all goes back to the argument, well, we're already starting to charge fees, so how do we respond to that? They said, well, you've got to go out and reject it. Washington law, and I can't imagine almost any state, says you have to stand up and affirmatively do something to reject a contract that otherwise has commenced operation. You know, even though you didn't request it, you made no suggestion for it, you have to come up and say do something affirmatively and through that agreement, 6,000 words plus, to try to figure out this provision versus this provision, this provision. After you've gotten out of jail, you have no money in your pockets other than this card. And to sit down and spend time reading that, you can't do it at the jail. They want you out of there. So none of that. Ultimately, we come back to what they agree is the ultimate observation has to be made. How does a reasonable person view all these facts taken together? Does this truly show mutual assent when you're forced to take it, when it starts running right away, when you actually have to, as you say, cancel the card, affirmatively reject it, and maybe work your way through it somehow to get a check, maybe, sometime when. And the record has not indicated actually any instance of where somebody is, of a million cards or whatever, of anyone actually doing that. There's nothing they say that, well, this is always available as an opportunity. There's never been a showing that any individual has actually gone through and done something like that. So that's all I have, Your Honor, unless you have any further questions. Judge Block, do you have any further questions? No, it looks like not. Thank you for your argument. I'd like to address a couple of the items that you talked with Mr. Yautz about, and we touched on briefly, because I just want to make clear there was a lot of discussion about there's no choice. There's no choice at the correctional facility between a release card and, well, anything else. Again, that's not up to us. That's the county's position. I believe what Mr. Moyer says is, well, at the county jail, I would like a choice between a release card and a check. And the county didn't give them that. That's true. That is the choice we gave them. So that's the choice that we gave them, the choice between it. Well, let me say again that not only does it say that you can cancel as opposed to not accept it, but it also says that the cryptic statement that you referred to says, close account with check disbursement, meaning first you have an account. So, again, there's no statement here that says you can simply not get into the agreement at all after it's been handed to you. Well, I would disagree with that interpretation. Really? Okay. I would also point out that Mr. Moyer admitted he didn't read the cardholder agreement at any time, any of the three that he received, and obviously failure to read the terms of a contract offer are not a defense to their enforcement. And so we've had a lot of conversations about what does this language mean, how would Mr. Moyer interpret it. He didn't read it. That was his decision. Again, I kind of go back big picture. He's given a release card. He's had several in the past. He knows how they work. There are terms and conditions physically attached to them, and he used the card. And to me, just on a common sense, much less legal basis, you use a card that's subject to the terms attached to it. Your Honor, you mentioned that a lot of these sound like contract enforcement defenses. I agree with you. They do. There is this argument of— Some of them do is what I think. Well, fair enough. But the idea of, well, if he doesn't have any money, does he really have a choice, that's a duress type of argument, maybe an unconscionability argument. I'm sorry. Isn't that relevant to contract formation? Well, no, because all of those types of enforcement defenses were delegated. That's not an enforcement defense. That's a question of whether there was an actual agreement, no? No, I think that those are enforcement defenses that would make the contract voidable if the party wanted to. But those issues go to the arbitrator under the delegation clause. I'd also point out that there's been a lot of talk about the unfairness of the fees or the number of fees, and that's not really an enforcement or a formation issue. That's more of a merits issue. I do just for the record want to point out that according to Kipsap County, and this is an excerpt of Record 714, it is our agency's experience that inmates are very satisfied with the secure card release program as compared to issuing checks as had been previously done. I'd also point out that in the information in the cardholder agreement, it lists numerous ways that the card can be used without incurring any fees. And so I just wanted the record to be clear that this idea that even if somebody uses the card, that's not, that can't be considered a sin really takes away an individual's right to enter into a contract where there's evidence in the record that shows that that is something that could be beneficial. If I'm released from jail and I'm given a check and I need to pay for a cab ride home, I can't. How about giving them cash? Well, but that's a county issue, as you identified earlier, Your Honor. That's not a rapid issue. Anything further, counsel? No, Your Honor. I didn't know you were funny. We appreciate your argument, both counsel and your briefing, and we'll take this matter under advisement. Thank you. Thank you. And I guess that's it for the day. We'll stand in recess. The decision of the court is now adjourned. Thank you.
judges: BERZON, CHRISTEN, Block